UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION AT KNOXVILLE

| | |
|---|---|
| ROBERT BLUESTONE, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. |
| Plaintiff, ) ) | <u>CLASS ACTION</u> |
| vs. ) ) | COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 |
| STEPHEN I. SADOVE, MARK W. ADDICKS, DONALD E. HESS, F. LANE CARDWELL, JR., KEVIN T. CLAYTON, JEFFREY J. O'NEILL, and JAMES F. HYATT, II, ) ) ) ) ) ) | |
| Defendants. ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Robert Bluestone ("Plaintiff"), by the undersigned attorneys, individually and on behalf of all others similarly situated, respectfully brings this class action for violations of §14(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants and alleges the following:

## SUMMARY OF THE ACTION

1. This is a stockholder class action brought on behalf of the former holders of Ruby Tuesday, Inc. ("Ruby Tuesday" or the "Company") common stock against Ruby Tuesday's Board of Directors (the "Board") for violations of federal law arising out of a misleading proxy statement recommending the go-private sale of the Company to certain affiliates of NRD Capital Management ("NRD") for $2.40 per share (the "Acquisition" or "Merger"), in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

2. Before the Merger, Ruby Tuesday was a publicly traded, multinational foodservice retailer that owned, operated and franchised restaurants.

3. In the years preceding the Merger, Ruby Tuesday's stock price suffered due to the Company's underperformance. However, management developed a turnaround plan that it expected would return value to shareholders in the long-term. Ruby Tuesday's management consistently assured its stockholders that this plan was viable and began implementing and accelerating this plan in 2016.

4. Ruby Tuesday was also better positioned than suggested by its stock price, because the Company owned a lot of valuable real estate. As recognized by analysts, shareholders, management and the Board, Ruby Tuesday real estate was worth more than the Company's enterprise valuation, and provided the Company with strategic alternatives not normally available to an underperforming company. For instance, Ruby Tuesday could monetize its real estate

through a sale and leaseback or financing transaction, and obtain the working capital to provide the runway for management to effectuate its turnaround plan to return value to the Company's stockholders, as management promised it could do.

5.     Throughout 2017, each member of the Board was provided information and analysis about the opportunities to unlock value from Ruby Tuesday's real estate holdings through a sale and leaseback or financing transaction numerous times, including in numerous Board meetings with the Company's financial advisor UBS Securities LLC ("UBS"). Each member of the Board was also informed of the viability of these strategic alternatives, including by numerous strategic parties that informed the Board that they were interested in Ruby Tuesday's real estate and interested in participating in a sale-leaseback transaction under which Ruby Tuesday would remain a standalone public company.

6.     However, Ruby Tuesday's Board – after going through management changes, litigation based on large stock drops, threat of proxy contests, and threat of personal litigation – had incentives to sell the Company rather than stay on and effectuate the turnaround plan. When activist pressure became too great, the Board chose to agree to a Merger for $2.40 per share, representing an enterprise value of approximately $335 million, when, *inter alia*: (1) the Board recognized NRD's opening offer of $3.50 per share as an unfair price; (2) the Company had at least $600 million in real estate; and (3) there were offers on the table that were more valuable for the Company's stockholders but would take longer for the Board to consummate.

7.     On October 16, 2017, defendants announced the Merger. On November 20, 2017, defendants issued the Definitive Proxy Statement on Schedule 14A (together with all amendments, the "Proxy"), recommending that Ruby Tuesday shareholders accept the $2.40 per share offer and vote in favor of the Acquisition.

8.	In the Proxy, defendants represented that the Merger price was fair and that the Merger was in the stockholders' best interests.  In support, defendants disclosed a summary of the financial analyses performed by UBS and UBS's opinion that the Merger price was financially fair.  Defendants indicated that the Merger was more favorable than other strategic alternatives, including a sale and leaseback or financing transaction.  At the same time, defendants did not disclose material financial information in their possession about the value and viability of a sale and leaseback or financing transaction.

9.	These omissions were material.  Stockholders needed this information in order to evaluate the choice they were being asked to make – accept Merger consideration that reflected the depressed value caused by Ruby Tuesday's current underperformance, or stay in the hopes that the Company's valuable real estate would provide the runway for management to effectuate its turnaround plan and return more value to the Company's stockholders.  Without this information, shareholders were unable to make an informed decision and were induced to accept the inadequate Merger consideration.

10.	Thus, defendants' violations of §14(a) of the 1934 Act harmed the Company's shareholders.  Plaintiff seeks damages to remedy defendants' violations of §14(a).

## JURISDICTION AND VENUE

11.	This Court has jurisdiction over the claims asserted herein pursuant to §27 of the 1934 Act for the violations of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

12.	This Court has jurisdiction over each defendant because each defendant is an individual who (1) had sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice, and (2) was actively and personally involved in the conduct giving rise to the claims

asserted herein, purposely availing himself or herself of this forum and the reasonably foreseeable consequences of that availment.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391, because the acts and transactions constituting the violations of federal law complained of herein have occurred in this District.

## PARTIES

14.     Plaintiff was, at all times relevant hereto, a shareholder of Ruby Tuesday.

15.     Stephen I. Sadove ("Sadove") was Ruby Tuesday's Chairman of the Board, and served on the Board from 2002 to the closing of the Merger.

16.     Mark W. Addicks ("Addicks") was a member of the Board, and served on the Board from 2014 to the closing of the Merger.

17.     Donald E. Hess ("Hess") was a member of the Board, and served on the Board from 2014 to the closing of the Merger.

18.     F. Lane Cardwell, Jr. ("Cardwell") was a member of the Board, and served on the Board from 2012 to the closing of the Merger.

19.     Kevin T. Clayton ("Clayton") was a member of the Board, and served on the Board from 2006 to the closing of the Merger.

20.     Jeffrey J. O'Neill ("O'Neill") was a member of the Board, and served on the Board from 2012 to the closing of the Merger.

21.     James F. Hyatt, II ("Hyatt") was Ruby Tuesday's President, Chief Executive Officer ("CEO") and a member of the Board, and served on the Board from April 2017 to the closing of the Merger.

22.     The defendants named above in ¶¶15-21 are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action individually on his own behalf and as a class action on behalf of all persons who held shares of Ruby Tuesday common stock on November 17, 2017, excluding defendants and their affiliates (the "Class").

24.     This action is properly maintained as a class action under Fed. R. Civ. P. 23(b)(1) and 23(b)(2).

25.     The Class is so numerous that joinder of all members is impracticable.  At the close of business on November 15, 2017, 61,190,829 shares of Ruby Tuesday common stock were issued and outstanding.

26.     A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this action as a class action.

27.     There are common questions of law and fact affecting the members of the Class. Among the questions of law and fact common to the Class which predominate over questions affecting individual class members are, *inter alia*, the following:

        (a)     Whether the Proxy contained any material misrepresentations or omitted any material information needed to make the Proxy not misleading; and

        (b)     Whether Plaintiff and the members of the class have been damaged and the proper measure of damages.

28.     Plaintiff's claims are typical of the claims of the Class because the harm suffered by Plaintiff and the other Class members was caused by the same misleading statements made by Defendants.  Plaintiff does not have interests antagonistic to or in conflict with the Class.

29.     Plaintiff is an adequate representative of the Class, has no interests adverse to the Class, is committed to fairly and adequately protecting the interests of the Class, and has retained competent counsel experienced in litigation of this nature.

30.     This action is maintainable under Rule 23(b)(1) and (3) of the Federal Rules of Civil Procedure.  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede absent Class members' ability to protect their interests.  Moreover, questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**Ruby Tuesday Embarks on its Turnaround Plan**

31.     Before the Merger, Ruby Tuesday was a Georgia corporation headquartered in Maryville, Tennessee.

32.     Ruby Tuesday opened its first restaurant in 1972.

33.     As of September 1, 2015, Ruby Tuesday owned and operated 656 Ruby Tuesday restaurants, and franchised 78 Ruby Tuesday restaurants in 44 states, 12 foreign countries, and Guam.  Ruby Tuesday also owned and operated 19 Lime Fresh fast casual Mexican restaurants, and franchised 8 Lime Fresh restaurants.

34.     In or around late 2015, Ruby Tuesday began to sell and close their Lime Fresh restaurants in order to focus on its core brand.

35.     On November 5, 2015 Ruby Tuesday announced an agreement to sell eight corporate-owned Lime Fresh restaurants to Rubio's Restaurants for approximately $6.3 million.

Ruby Tuesday announced that it would close the remaining 11 corporate-owned Lime Fresh restaurants and maintain only its eight franchised locations.

36.     J.J. Buettgen ("Buettgen"), then-Chairman of the Board, President, and CEO, stated in the press release announcing the Lime Fresh sale: "As we consider Ruby Tuesday's future, we believe it is in our shareholders' best interest that we exclusively operate our namesake brand restaurants."

37.     Buettgen also indicated that the Lime Fresh sale was part of the Company's long-term plan to grow shareholder value despite the expected downturn in the casual dining industry. He stated: "We are highly engaged and continue to make progress on our transformational initiatives for Ruby Tuesday"; "We are confident in our long-term strategies and believe we have laid the foundation to deliver improved operational results over time."

38.     In or around early 2016, Ruby Tuesday publicly disclosed additional information about its long-term plan, including certain initiatives to freshen up its menu, add a garden bar to its restaurants, remodel its restaurants, and improve communications with its target customers.

39.     On January 7, 2016, in a press release announcing Ruby Tuesday's fiscal second quarter 2016 financial results, Buettgen stated: "Going forward, we will continue to lead our brand transformation, executing on our new key priorities which include enhancing the menu offerings, testing our new Garden Bar initiative and remodel program while communicating more effectively with our target customer through digital and social media. We believe these initiatives will foster higher guest retention and frequency across all Ruby Tuesday locations over the longer term and ultimately produce sustainable same-restaurant sales growth, improve our long-term profitability, and maximize value for our shareholders. I would like to thank our entire team for their commitment to implementing our brand transformation strategy."

40.     In the earnings call for Ruby Tuesday's fiscal second quarter 2016 financial results, Buettgen stated that management believed the Company's "specific initiatives" would "drive topline growth." He stated that the Company had a plan to "rebuild[] our business with women and families with young children." He explained: "We're keenly focused on targeting women ages 25 to 40 with young families and on winning back their business." "Our first priority is to communicate more effectively through our new marketing strategy." "Our second priority is to deliver culinary innovation and value in our food offering through our core menu and through meaningful improvement through our Garden Bar." "[O]ur third priority is to revitalize our brand through remodeling efforts."

41.     On April 7, 2016, Ruby Tuesday announced weaker-than-expected third quarter 2016 financial results, and revised its guidance downwards for fiscal 2016.

42.     Ruby Tuesday management continued to believe in the viability of the Company's long-term plan despite Ruby Tuesday's disappointing results and anticipated continued challenges in the casual dining industry.

43.     In the press release announcing the third quarter 2016 financial results, Buettgen stated: "Our third quarter was a volatile period affected by weather, softness in the casual dining industry, and increased promotional activity by our peers. Despite this challenging environment, we continue to believe that our key brand initiatives will drive an improvement in guest counts."

44.     He also stated: "We are encouraged by our early results in attracting and delighting women and young families with our Garden Bar initiative and by the lift we are seeing so far at our remodeled locations. We remain focused on better in-restaurant execution, refining our media and targeting plans, and incorporating what we've learned from our Garden Bar and remodel tests into our go forward strategy. This gives us confidence that we can return to same-restaurant sales growth and higher operating profitability. While not yet visible in our results, we believe that we

have the right framework in place to attract more women and families and increase visits from our current Ruby Tuesday guest."

45.     In the earnings call for Ruby Tuesday's third quarter 2016 financial results, Buettgen further stated: "We continue to make progress in the third quarter on several key brand transformation initiatives that we believe can help us attract more women and families over time, and drive more visits from our current guest space.  More specifically, we are encouraged by our early results in attracting and delighting women and families through digital and social media with our garden bar test and by the early results we are seeing at our remodeled locations."

46.     He further stated: "We are encouraged by the early progress we are seeing, which gives us confidence that we can return the same-restaurant sales growth and higher operating profitability.  While it's not yet visible in our results, we believe we have the right framework in place to attract more women and families and increased visits from our current Ruby Tuesday guests."

47.     Upon the announcement of the Ruby Tuesday's third quarter 2016 financial results, the Company's stock immediately fell almost 12% (and continued to drop more than 18% in the month of April).

48.     The Company's CFO, Jill Golder, resigned as of April 11, 2016.  Moreover, a class action was filed against Ruby Tuesday, Buettgen and Golder in connection with the purported damage to stockholders from the fall in Ruby Tuesday stock.

49.     On May 5, 2016, the Board adopted and approved an executive severance plan and a change in control severance plan, ensuring that the Company's management would receive large lump sum payments if the Company were sold.

50.     On June 1, 2016, Ruby Tuesday announced the sale of the Lime Fresh brand (the intellectual property rights and the franchising rights) to EverFresh Endeavors for $4.6 million, substantially completing the Company's exit from the Lime Fresh brand.

51.     On June 6, 2016, Ruby Tuesday announced the appointment of Sue Briley ("Briley") as Interim CFO.

52.     On August 11, 2016, Ruby Tuesday announced a quarterly loss for its fourth quarter fiscal 2016 financial results.

53.     Ruby Tuesday management – who continued to expect that the macro environment would remain challenging for some time – reminded stockholders that the Company had a viable long-term plan, that would return stockholder value in the future.   Management disclosed additional details about its long term plan, including: (1)  the Company's "Fresh Start Initiative" – a plan designed to "streamline the organization, improve financial profitability, and create long-term value for shareholders"; and (2) the Company's asset rationalization plan ("Asset Rationalization Plan").

54.      With respect to the Fresh Start Initiative, this initiative had three components: (1) Fresh New Menu; (2) Fresh New Garden Bar; and (3) Fresh Experience.  Fresh New Menu was a plan to implement a new core menu featuring new salads, new appetizers and reducing the total number of items offered by approximately 30% to remove underutilized and overly complicated options.  Fresh New Garden Bar was a plan to roll out its new garden bar (greens, vegetables, toppings, dips, fruits, salad dressings) across all Ruby Tuesday restaurants.  Fresh Experience was a plan to continue to improve customer service and remodel certain restaurants.

55.     In the press release announcing the fourth quarter and fiscal year 2016 financial results, Buettgen stated with respect to the Fresh Start Initiative: "Our Fresh Start Initiative has been designed to streamline our organization through asset rationalization, improve financial

profitability, and ultimately create long-term value for shareholders.  Our Fresh New Menu, Fresh

New Garden Bar, and Fresh Experience initiatives will position us to accelerate traffic and will be

supported by better in-restaurant execution, refining our media and targeting plans, and

incorporating the insights from our Garden Bar and remodel tests into our go forward strategy.

Through our goal of attracting more women and young families as well as increasing visits from

our current Ruby Tuesday guests, we believe we can return to positive same-restaurant sales,

expand restaurant level margins, and increase operating profit."

56.     In the earnings call, Buettgen stated:

Given this backdrop [referring to the Company's fiscal fourth quarter performance]
and our expectation that the macro environment will remain challenging for some
time, we are taking the necessary steps to change the trajectory of our business
through our Fresh Start initiative.

Our Fresh Start initiative has been designed to streamline our organization
and ultimately create long-term value for shareholders. We believe executing
against our Fresh Start initiative will improve the overall health of our organization
and better position us to gain topline moment and drive improvement in guest
counts.

57.     With respect to the Asset Rationalization Plan, this was a plan to identify, then

eliminate underperforming restaurants.  First, Mike Ellis, the Company's Chief Development

Officer, "in consultation with" the Board and management, conducted a comprehensive rigorous,

detailed analysis of each corporate-owned restaurant in Ruby Tuesday's portfolio, including "a

rigorous unit-level analysis of sales, cash flows and other key performance metrics, as well as site

location, market positioning and lease status."  Based on the analysis, the Company determined to

"close approximately 95 underperforming restaurants" by  September 2016.

58.     In the earnings call announcing the fourth quarter and fiscal year 2016 financial

results, Buettgen stated:

The Fresh Start initiative will be achieved through the execution of several key
strategies, including an Asset Rationalization Plan, together with plans to improve
the food and beverage offering, dining environment and service through Fresh New

Menu, Fresh New Garden Bar and Fresh Experience. These initiatives will be rolled out in phases across multiple markets throughout the coming quarters.

Asset rationalization is a meaningful component of our Fresh Start initiative. We have completed a comprehensive review of our corporate owned real estate portfolio, which included a rigorous unit level analysis of sales, cash flow and other key performance metrics as well as site, location, market positioning and lease status. After completing our review, we have determined that it's in our best interest to close approximately 95 underperforming restaurants. These locations will cease operations by September 2016. The decision to close restaurants is difficult but a necessary step as we take aggressive actions to strengthen the Company.

59.     In the earnings call, Mike Ellis, the Company's Chief Development Officer further stated:

We believe the Asset Rationalization Plan that we've announced today as part of our Fresh Start initiative, will better position us to achieve our goal of returning to same-restaurant sales growth and higher operating profitability.

In joining the Company as Chief Development Officer, my first test was to perform a deep dive to assess the following key attributes of each location. First, we looked at the financial performance of each restaurant in the portfolio; second, we evaluated the market wide unit count and specific restaurant placement; third, we examined the demographic makeup surrounding each restaurant; next, we assessed traffic patterns to determine the site visibility and accessibility from surrounding roads, proximity of competitors and nearby traffic generators; finally, we considered the lease or ownership structure in place at the location.

60.     In the fourth quarter and fiscal year 2016 earnings call, Buettgen stated with respect to the Company's expectations going forward:

Based on our outlook for 2017, we'll be a stronger, healthier Company as we execute against the strategies of our Fresh Start initiative with the goal of driving sustainable growth going forward.  While the decision to close restaurants is never an easy one to make and we are cognizant of the impact it will have on some many of our valued team members, it is necessary step to improve the health and profitability of the Company.  By closing these underperforming locations and optimizing our footprint, we can be more cost effective and focus our resources on traffic driving initiatives such as our Fresh New Menu, Fresh New Garden Bar and Fresh Experience through our service improvements and remodeling tests.  We also expect to provide even better dining experiences for our guests as our operations teams concentrate their efforts on supporting our higher potential locations in markets.

61.     Buettgen concluded:

> Our first start initiative will be a catalyst to accelerate our financial performance while we continue to reduce our cost structure and improve our operating efficiency. I'm confident that we have the strategies in place to significantly enhance our food offering, execute our Garden Bar rollout and deliver a superior guest experience through improvements in service and atmosphere.
>
> With the continued hard work of our teams and committed operating partners Ruby Tuesday is on the path to returning to sustainable profitable growth as it kicks off fiscal 2017 with a brand new Fresh Start.

62. On September 13, 2016, Ruby Tuesday announced the resignation of Buettgen as the Company's CEO. The Company announced that, effectively immediately, F. Lane Cardwell, Jr. ("Cardwell") would serve as the Company's Interim President and CEO.

**NRD Indicates Interest at a $3.50 Per Share Offer Which the Board Considers Too Low Compared to its Strategic Plan and Available Strategic Alternatives**

63. On September 23, 2016, NRD sent an indication of interest in a potential acquisition of Ruby Tuesday at a price of $3.50 per share.

64. The Proxy states that the Board decided that the $3.50 per share offer was inadequate and "not in the best interests" of the Company, and the Board indicated that management should continue with its Fresh Start Initiative. The Proxy states that the Board made this decision "after consultation with UBS and management." UBS was a financial advisor who had previously served as a financial advisor to the Company in connection with share repurchases in 2016.

65. On October 5, 2016, the Board held a meeting which was attended by each Individual Defendant (the Proxy does not state any Board member was absent) and UBS. At this meeting, the Board and UBS discussed potential merger and acquisitions activity, the Company's potential defenses to same, and "the process for determining the value of Ruby Tuesday's real estate portfolio as an important step in evaluating Ruby Tuesday's financing alternatives."

66. Notably, with respect to Ruby Tuesday's real estate, the Company was well aware that a sale-leaseback of the Company's real estate could unlock significant value. By way of example, a March 29, 2011 *StreetInsider.com* article stated:

> Credit Suisse made positive comments on Ruby Tuesday Inc. (NYSE: RT) Tuesday, saying a sale-leaseback transaction could unlock significant value for investors.
>
> Analysis done jointly with the firm's REIT team shows the company's real estate is valued at $567-$708 million, which implies a 3-4x multiple on the underlying business, significantly undervaluing the company.
>
> "We believe 5.0x-6.0x would fairly value it, and a sale leaseback transaction could generate 30%-40% of upside simply by clarifying what investors are paying for the underlying," says analyst K. Siegner.
>
> Even if a transaction does not occur, which the analysts see as most likely, they said the analysis makes a clear case for multiple expansion while putting a floor at 80% of the current share price.

67. Moreover, a July 25, 2016 *thestreet.com* article noted:

> However, many investors are forgetting that company-owned real estate like what Ruby Tuesday owns can provide restaurant chains with some good turnaround options. For example, Denny's (DENN) managed to right the ship at least partly through refranchising. The chain sold company-owned real estate to franchisees and used the proceeds to reduce debt.
>
> Similarly, Cracker Barrel did a sale-and-leaseback transaction several years ago that brought in $45.2 million for 15 stores (or just over $3 million per store). Perhaps RT can learn a lesson from both of these companies and do the same.

68. On October 6, 2016, Ruby Tuesday announced a quarterly loss, but sequential improvement, for its fiscal first quarter 2017 financial results. Ruby Tuesday also announced that: (1) it was currently on track with respect to its Fresh Start Initiatives and the Asset Rationalization Plan, including closing 95 underperforming restaurants, planning to launch its new core menu in November 2016 across all restaurants, rolling out its Fresh New Garden Bar across all restaurants in January 2017, and completing its restaurant remodels; and (2) the Company's management planned to accelerate the implementation of its initiatives in order to move the Company more quickly closer to obtaining the long term growth expected by management.

69.    Cardwell stated in the press release announcing Ruby Tuesday's fiscal first quarter 2017 financial results:

> "While the casual dining environment remains highly competitive and challenging as evidenced by our negative quarterly same-restaurant sales, our trend improved sequentially during the first quarter as we made investments in highlighting value aimed at building guest counts.  In fact, we generated positive traffic in August through a successful 3 Course Meal offer for $12.99."

70.    Cardwell further stated: "Our underlying goal is to drive traffic through the key strategies of our Fresh Start initiatives that we are launching in the coming months.  These include our Fresh New Menu, Fresh New Garden Bar, and Fresh Experience.  In each of these key areas, we are accelerating our actions as we believe these improvements will have a positive impact on our performance through increasing guest count and frequency."

71.    Cardwell further stated:

> "We are embarking on a period of accelerated strategic change for Ruby Tuesday, and we believe that with a thoughtful but decisive approach, we can deliver improved profitability and enhance shareholder value.  We are excited about the new products coming to market this fiscal year including our new menu in November, the relaunch of successful promotions, and the roll out of the enhanced Garden Bar system-wide in January.  I am confident that these strategies coupled with our service improvements will bring same-restaurant sales back into positive territory in fiscal 2017."

72.    In the earnings call discussing Ruby Tuesday's fiscal first quarter 2017 financial results, Cardwell stated:

> [A]t this time, the Board believes Ruby Tuesday requires a new leader to spearhead the Company's go forward plan.  We understand that we need to move with greater urgency to change the trajectory of the business.  I've therefore been working diligently with our Senior Executive team over the past few weeks implementing our strategic initiatives at a faster pace.

73.    He further stated:

> As we stated on our previous conference call and are reiterating again today, we are confident that the key strategies of our Fresh Start initiatives can deliver higher levels of profitability in the future than what we've achieved in the past.
>
> However as we accelerate the execution of our Fresh Start initiatives we need to focus more on achieving our long term strategic objectives rather than

trying to simultaneously meet near term milestones. One must give precedence to the other. I'm confident that these strategies coupled with our service focus will bring same store restaurant sales back into positive territory in fiscal 2017.

74.     On October 11, 2016, Cardwell met with Azia Hashim ("Hashim"), the founder and managing partner of NRD.

**Engaged Capital Begins Agitating For a Sale**

75.     On November 14, 2016, Engaged Capital LLC ("Engaged Capital") filed a Schedule 13F with the SEC indicating that it held approximately 3.3% of Ruby Tuesday stock as of September 30, 2016.

76.     Engaged Capital is an activist investor, that (according to FactSet Research Systems Inc.) has launched 22 activist campaigns, including 11 director-election proxy battles since 2013 and insurgencies that have driven companies to sell themselves.

77.     Subsequently, as admitted in the Proxy, Ruby Tuesday's management team had numerous discussions with Engaged Capital regarding the "estimated value of Ruby Tuesday's real estate assets."

78.     On December 31, 2016, Ruby Tuesday announced that it entered into a waiver relating to its four-year revolving credit agreement with Bank of America, N.A., as administrative agent and issuing bank (the "Senior Credit Facility").

79.     On January 4, 2017, UBS discussed with the Board – that is, each Individual Defendant (the Proxy does not state any Board member was absent) – its preliminary valuation of Ruby Tuesday based on Ruby Tuesday's management's financial projections dated November 11, 2016.

80.     At the same time, UBS discussed with each Individual Defendant the "methods of assessing the value of Ruby Tuesday's owned real estate for financing purposes."

81.     On January 5, 2017, Ruby Tuesday announced a quarterly loss, but sequential improvement (including outperforming the industry), for its fiscal second quarter 2017 financial

results. Ruby Tuesday also announced that: (1) it was currently on track with respect to its Fresh Start Initiatives and the Asset Rationalization Plan, including selling 25 properties with average expected net proceeds of $1.6 million per location, launching its new core menu in November 2016 across all restaurants, planning to roll out its Fresh New Garden Bar across all restaurants in January 2017, and completing additional restaurant remodels; and (2) the Company's management continued to believe that the Company's initiatives would return significant value to shareholders in the long term.

82.     Cardwell stated in the press release announcing the fiscal second quarter 2017 financial results: "While the results of our fiscal second quarter were disappointing, I am excited about the strategic changes and the new product rollouts that began with the introduction of our Fresh New Menu in November and will continue in January with the national launch of our Fresh New Garden Bar."

83.     He further stated: "Our progress in executing the key strategies of the Fresh Start initiative should be viewed in two stages. The first is marked by the launch of our Fresh New Menu in mid-November while the second is marked by the launch of the enhanced Garden Bar in mid-January. We believe this combination will ultimately have a positive impact on our performance through increasing guest count and frequency."

84.     In the earnings call discussing the fiscal second quarter 2017 financial results, Cardwell stated:

> Let me be upfront in saying that our quarterly performance does not yet reflect the strategic changes made since our change in leadership or the new product rollouts that began in November and will continue later this month. While our financial results during the second quarter are far from where they should be, we believe that the strategies we are implementing will ultimately grow guest traffic and profitable sales at Ruby Tuesday.

85.     He further stated:

While our second quarter same restaurant sales decline of 4.1% was below our expectations, we made progress on customer traffic. Guest counts fell 2.8% improving sequentially from last quarter and outperforming the industry by approximately 140 basis points. As these metrics suggest, we can bend the trend with respect to the number of people dining in our restaurants when we effectively communicate our value proposition.

86.   He further stated: "We are moving with greater urgency to change the trajectory of our business through renewed focus on our guests. We are confident that the key strategies of our Fresh Start Initiative will drive greater engagement with women and families as we better position Ruby Tuesday to achieve top line growth and higher operating profitability."

87.   On January 11, 2017, NRD sent a letter to the Board reiterating its interest in a potential acquisition of Ruby Tuesday at a price of $3.50 per share.

88.   On February 13, 2017, the Board held a telephonic meeting which was attended by each Individual Defendant (the Proxy does not state any Board member was absent). At this meeting, UBS also reviewed with each Individual Defendant viable strategic alternatives available to Ruby Tuesday, including "a sale of the restaurants operated by Ruby Tuesday to new or existing franchisees, closure of Ruby Tuesday's underperforming restaurants and a sale of the related real estate, a sale-leaseback financing transaction and remaining as a standalone public company."

89.   On February 27, 2017, NRD sent the Board a letter expressing interest at a reduced price range of $2.50 to $3.00 per share. According to the Proxy, NRD "did not provide any written proof of funds or any proposal on financing arrangements."

**Ruby Tuesday Agrees to Launch a Strategic Process Amid Increasing Activist Pressure**

90.   On March 3, 2017, the Company entered into an engagement letter with UBS. Pursuant to the engagement letter, Ruby Tuesday agreed to pay UBS an aggregate fee of $5.36 million, of which $100,000 was payable on the first day of each quarter beginning on March 3, 2017, $1.5 million was payable upon delivery of UBS's opinion, and the remainder was contingent upon consummation of a merger.

91.    On March 7, 2017, NRD submitted a revised offer of $2.51 per share.  NRD additionally informed Ruby Tuesday that it was not willing to provide Ruby Tuesday written copies of its financing letters.

92.    On March 11, 2017, Sadove (the Company's Chairman of the Board) spoke with Hashim (NRD's managing partner) to inform Hashim, in advance, of Ruby Tuesday's intent to launch a strategic process.

93.    On March 13, 2017, Ruby Tuesday made a public announcement that it "will explore strategic alternatives in order to maximize shareholder value and position the business for long-term success."

94.    On March 15, 2017, a *Nation's Restaurant News* article noted that "there will be buyers, thanks to [Ruby Tuesday's] real estate."  The article noted:

> Ruby Tuesday has a market cap of about $120 million, and an enterprise value of about $300 million. Yet it also has property assets of about $600 million, mostly from the ownership of 300 locations.
>
> Thus, for a cash price of, say, $150 million, you could get a chain that generates $1 billion in revenue per year. And if you can't make that work, then you can just sell the real estate and double your cash.
>
> "What's your risk?" said Craig Weichmann, partner with Meyer Metz Capital Partners. "You can double or triple your money just by moving the property."

95.    On March 24, 2017, Leon Capital Partners, LLC ("Leon") filed a Schedule 13D with the SEC disclosing that it had acquired approximately 9.5% of the outstanding shares of Ruby Tuesday common stock

96.    A March 27, 2017 article in *thestreet.com* observed that "[a] wolf pack of activist investors is accumulating Ruby Tuesday (RT) shares."

97.    From March 2017 to April 2017, UBS contacted and had discussions with various potential strategic parties.  During this period, parties indicated an interest in acquiring Ruby

Tuesday at a price significantly higher than the Merger price, including a proposal at $5.75 per share and a proposal at $400 to $450 million.

98.     Also during the March 2017 to April 2017 period, numerous parties indicated an interest in Ruby Tuesday's real estate and/or indicated that their acquisition contemplated monetizing Ruby Tuesday's real estate, including the following:

- on April 13, 2017 or April 14, 2017, Bidder 6 submitted a proposal to purchase the entire company for an enterprise value of $400 to $450 million, or in the alternative, to acquire Ruby Tuesday's restaurant business, with the expectation that it would partner with a third party interested in entering into a sale-leaseback transaction with respect to Ruby Tuesday's real estate assets;

- on April 13, 2017 or April 14, 2017, NRD offered to purchase Ruby Tuesday at the price of $2.51 per share, or in the alternative, to acquire Ruby Tuesday's restaurant business, with the expectation that it would partner with a third party interested in entering into a sale-leaseback transaction with respect to Ruby Tuesday's real estate assets;

- on April 13, 2017 or April 14, 2017, Bidder 8 submitted a proposal to acquire only Ruby Tuesday's real estate assets, pursuant to a sale-leaseback transaction for an enterprise value of $315 million;

- on April 13, 2017 or April 14, 2017, Bidder 9 submitted a proposal to acquire only Ruby Tuesday's real estate assets, pursuant to a transaction structure to be determined without providing the purchase price;

- on April 28, 2017, NRD's financial advisor sent UBS a letter requesting "additional information regarding Ruby Tuesday's real estate"; and

- on May 4, 2017, Bidder 9 told UBS again that it was interested in acquiring only Ruby Tuesday's real estate.

99.     On April 6, 2017, Ruby Tuesday announced the appointment of James F. Hyatt, II as the Company's President and CEO and new Board member, effectively immediately.

100.    On April 6, 2017, Ruby Tuesday announced a quarterly loss, but sequential improvement (including outperforming the industry), for its fiscal third quarter 2017 financial results. Ruby Tuesday also announced that it was currently on track with respect to its Fresh Start Initiatives and the Asset Rationalization Plan, including that it was "in the contract process to sell 28 properties with average expected net proceeds of $40.4 million or approximately $1.4 million

per location," it launched its both its new core menu and its Fresh New Garden Bar across all restaurants, and it was continuing to complete remodels.

101.    Cardwell stated in the press release announcing the fiscal third quarter 2017 financial results:

> The casual dining environment remains highly challenging, promotional, as well as price competitive and our sales trends are reflective of these conditions. Still, we are encouraged by the sequential progress we demonstrated during our third quarter relative to the industry. Specifically, we narrowed our performance gap with respect to same-restaurant sales and average check and have now outperformed in guest counts for three consecutive quarters. More importantly, we are encouraged by recent trends and expect further sequential improvement in operating performance as well as same-restaurant sales in the fourth quarter.

102.    On May 5, 2017, the Company's management revised its five-year projections which, according to the Proxy, "included lower same store sales revenue growth forecasts, higher EBITDA margins due to lower cost of goods sold, payroll and marketing expenses, and higher maintenance capital expenditure, as compared to the previous financial plan provided on March 7, 2017."

103.    On May 15, 2017, Hyatt, UBS and NRD met in New York.

104.    As May 16, 2017, The Boaz Group ("Boaz") – referred to as Bidder 11 in the Proxy – contacted UBS seeking to participate in the sales process.

105.    On June 1, 2017, Engaged Capital sent a letter to the Board urging the Board to pursue a sale of the Company. Engaged Capital indicated that the Board should delay the process for director nominations for the 2017 annual meeting until the conclusion of the sales process, in essence threatening a public proxy unless the Board agreed to a sale.

106.    On June 5, 2017, the Board sent a response letter to Engaged Capital, acceding that it was conducting a sales process as demanded.

107. Throughout June 2017, numerous parties continued to indicate their interest in Ruby Tuesday's real estate and/or indicated that their acquisition contemplated monetizing Ruby Tuesday's real estate, including the following:

- on June 2, 2017, Boaz sent a proposal to acquire Ruby Tuesday's domestic assets for $375.5 million on a debt-free basis through a joint venture transaction, to be funded entirely in cash;

- on June 6, 2017, Bidder 2 told UBS that it was interested in purchasing Ruby Tuesday's real estate;

- on June 8, 2017, NRD submitted a revised acquisition proposal at a price of $2.77 per share, to be funded by, among other things, proceeds of sale-leaseback financing;

- on June 12, Bidder 7 and Bidder 8 submitted a joint proposal contemplating, among other things, financing of $315 million from Bidder 8 in connection with the sale-leaseback of Ruby Tuesday's real estate;

- on June 12, Bidder 2 submitted a proposal offering to purchase Ruby Tuesday at $3.05 per share (valuing Ruby Tuesday at an enterprise value of $375 million), or alternatively to purchase Ruby Tuesday's 269 owned properties for $317.5 million through a hybrid sale-leaseback structure;

- on June 12, Boaz submitted a proposal offering to purchase Ruby Tuesday for an aggregate merger consideration of $375 million, accompanied by a letter of intent from a financing source for "a sale-leaseback transaction in the amount of $375 million with respect to Ruby Tuesday's 269 owned properties"; and

- on June 14, 2017, Boaz submitted an offer to acquire Ruby Tuesday for $2.883 per share, which would be financed with, among other things, $375 million from a sale-leaseback transaction.

108. On June 19, 2017, Boaz submitted a revised offer to acquire Ruby Tuesday for $3.50 per share.

109. On June 21, 2017, NRD sent an email to the Board proposing $2.55 with 15 business days for exclusivity, or $2.85 with 30 business days for exclusivity.

**The Ruby Tuesday Board is Threatened With Litigation if They Don't Sell Soon**

110. On June 27, 2017, a purported shareholder of Ruby Tuesday published an article on *Seeking Alpha*, indicating that the Board's fiduciary duty required them to sell the Company

now.  The article identified the Board directors by name, indicated that three directors' terms were set to expire, and that if the Board did not accept a "viable bid," "we plan to do everything in our power to hold each individual personally liable to the fullest extent possible."

111.    The article also stated that "[t]he real estate value is real, and it belongs to shareholders."  The article stated:

> Our conversations with industry operators indicate that the replacement cost of the average company-owned location is approximately $2M. We have also analyzed all of the Ruby Tuesday locations that have been listed for sale recently. The average listing price is slightly over $2M per location.  We can debate what haircut to the listing price is appropriate for each location and how much the properties not listed are worth, but in general, the real estate assets are relatively homogenous. Our analysis indicates the real estate assets imply an equity value of $2.50-$3.50 per share for shareholders.

112.    This article is specifically mentioned in the Proxy, thus it can be reasonably inferred that each Individual Defendant read this article.

113.    On June 29, 2017, NRD submitted a revised proposal to acquire Ruby Tuesday for $2.55 per share.

114.    On June 30, 2017, Boaz delivered a revised draft commitment letter from its sale-leaseback partner.

115.    On June 30, 2017, the Board adopted an exclusive forum provision, to limit anticipated lawsuits (including potential shareholder lawsuits) to Georgia.

**The Ruby Tuesday Board Recognizes the Viability of a Sale-Leaseback Transaction, But Agrees to Negotiate a Sale Exclusively with NRD**

116.    During July 2017, the Board recognized the viability of a sale-leaseback transaction that would not result in a sale of Ruby Tuesday (including at the July 3, 2017 and the July 19, 2017 Board meetings which were attended by each Individual Defendant), and received analysis from UBS and Bidder 8 (including a model and analyses provided by Bidder 8 on July 11, 2017) regarding the viability of such a sale-leaseback transaction.

117. Also during July 2017, numerous parties continued to indicate their interest in Ruby Tuesday's real estate and/or indicated that their acquisition contemplated monetizing Ruby Tuesday's real estate, including the following:

- on June 12, 2017, Boaz reiterated its proposal for an acquisition at $3.50 per share, financed through a $375 million sale-leaseback transaction and $100 million in equity funding, and included a letter of intent from the financing source with its proposal;

- on July 13, 2017, "Bidder 2 submitted an offer to acquire 62 fee simple sites owned by Ruby Tuesday for $46.5 million in cash";

- on July 20, 2017, Leon sent a letter urging the Ruby Tuesday board to consider a sale-leaseback of certain real estate assets as a possible strategic alternative; and

- on July 24, 2017, Bidder 8 met with Ruby Tuesday's management and UBS to "jointly develop the plan for a sale-leaseback transaction, which involved a store-by-store analysis."

118. On August 1, 2017, the Board received a letter from a stockholder, indicating an imminent proxy contest.

119. On August 13, 2017, the Board agreed to enter into a No-Shop Agreement with NRD at $2.55 per share. As of this date, there were higher offers on the table including: (i) Boaz's offer at $2.88 per share, submitted on July 25, 2017; and (ii) Bidder 8's offer for either (a) a sale-leaseback transaction under which Ruby Tuesday would remain a standalone public company; and (b) an acquisition at $2.45 per share, contingent on equity rollover of management.

**NRD Lowers its Price, the No-Shop Period Expires, and the Board Agrees to the Merger Even Though There is a Higher Offer on the Table**

120. The Proxy states that on August 15, 2017, "Hyatt, a representative of the leading restaurant chain and UBS met to discuss a potential standalone sale-leaseback transaction between Bidder 8 and Ruby Tuesday." The Proxy mentions nothing more about Bidder 8 after this meeting.

121. On August 21, 2017, Ruby Tuesday announced a quarterly loss, but sequential improvement, for its fiscal fourth quarter and fiscal year 2017 financial results. Ruby Tuesday

also announced that the Company's management continued to believe in its "comprehensive strategy" for long term growth.

122.    In the press release announcing the results, Hyatt stated:

"While the casual dining environment remains challenging and highly competitive, we are pleased to have achieved a sequential improvement in same-restaurant sales and operating performance for the fourth quarter as we had expected. Our same-restaurant sales trend improved 240 basis points from a 4.0% decline in the third quarter to a 1.6% decline in the fourth quarter while we held our performance gap relative to the industry constant. Additionally, we reported adjusted net income for the fourth quarter following three quarters of adjusted net losses, as we have stemmed the decline in our top-line while controlling expenses. Looking ahead to fiscal 2018, we expect to achieve year-over-year improvement in restaurant level margins and EBITDA as we execute our new 'Plan to Win' strategy."

123.    He continued: "'Based on learnings from the field and feedback from team members and guests, we have developed our "Plan to Win" road-map for the next 12 months. Our top three priorities are to improve the total guest experience, ignite same-restaurant sales growth, and deliver system profitability. We have developed a comprehensive strategy to realize these goals over the stated time frame and believe this game plan will position Ruby Tuesday towards achieving sustained profitable growth and increasing shareholder value.'"

124.    In the earnings call, Hyatt stated:

These specific strategies and tactics are developed to address our sales and operational challenges, improve financial profitability, and thereby enhance long term value for shareholders.

Our top three priorities are; one, dramatically improve the total guest experience; two, ignite same restaurant sales growth; and three, deliver system profitability. Importantly, we expect to achieve year-over-year improvement in restaurant level margins and EBITDA in fiscal 2018 as we execute against our new plan to win strategy. And I'll provide more detail on our plan to win shortly.

It's important to note that we are still conducting a strategic and financial review aimed at maximizing shareholder value. We have been working diligently with our financial advisor and legal counsel to review all options available to us. However, we cannot provide any assurance that a transaction will occur or what the terms would be of such a transaction. Although, the strategic alternatives review process is ongoing, it is entering its final stage and we expect that it will be completed without delay.

125.    As of September 5, 2017, there were 599 Ruby Tuesday restaurants system-wide, of which 541 were Company-owned.

126.    On September 13, 2017, the exclusivity period under the No-Shop Agreement expired.  NRD did not deliver financing by this date as contemplated by the No-Shop Agreement.

127.    The Proxy does not indicate that the Board used this opportunity to reach out to other viable bidders.

128.    On October 9, 2017, Boaz submitted an offer of $2.88 per share.

129.    On October 11, 2017, NRD told UBS that it was revising its offer down to $2.40 per share (from $2.55 per share).

130.    On October 13, 2017, NRD sent its final offer of an acquisition at $2.40 per share.

131.    On October 15, 2017, the Board held a meeting which was attended by each Individual Defendant (the Proxy does not state any Board member was absent).  At this meeting, UBS presented its fairness analyses, which is summarized on pages 51 and 52 of the Proxy.[1]

132.    The Board unanimously approved the Merger Agreement and the Merger.

133.    The Proxy states that Board considered the following one of the principal factors supporting its decision:

[T]he Ruby Tuesday board's belief that the merger was more favorable to Ruby Tuesday's stockholders than the alternative of remaining a standalone independent company, which belief was based on and informed by consideration of a number of factors, risks and uncertainties, including:

*        *        *

the Ruby Tuesday board's belief that, although Ruby Tuesday could, similar to Holding's financing plan for its acquisition, seek to unlock value from Ruby Tuesday's real estate holdings (*e.g*., through a sale and leaseback or financing transaction), the remaining operational, industry and other risks and challenges to

---

[1]    Additionally, the proxy supplement filed on December 11, 2017 contained additional information regarding UBS's financial analyses.

Ruby Tuesday's business described above create substantial execution risks relative to the $2.40 per share price in the merger . . . ."

134.    On October 16, 2017, Ruby Tuesday announced the Merger.

135.    On October 30, 2017, the Board postponed the Company's 2017 Annual Meeting of Shareholders, previously scheduled for January 22, 2018 in light of the Merger.

**Defendants File a Materially Misleading Proxy, Reject a Higher Offer, and Complete the Merger**

136.    On November 20, 2017, defendants filed the Proxy (which was supplemented on December 11, 2017).  As discussed below, the Proxy contained misleading statements preventing an informed shareholder vote on the Merger.

137.    On December 18, 2017, Ruby Tuesday announced that it received another offer from Boaz for $2.88 per share.  Ruby Tuesday characterized the offer as "highly-conditional and not fully-financed" and stated that the Board "unanimously determined that the proposal did not constitute and would not reasonably be expected to lead to a superior proposal as compared to the acquisition by NRD Capital and therefore rejected the proposal."

138.    On December 20, 2017, pursuant to an uninformed vote, the Company obtained shareholder approval of the Merger.

139.    On December 21, 2017, NRD completed the Merger.  The Merger represented an enterprise value of approximately $335 million.

140.    On December 21, 2017, Ruby Tuesday entered into a Real Estate Sale Contract with an affiliate of NRD, pursuant to which the NRD affiliate purchased certain real properties from the Company for approximately $242 million, then sold the same properties to five strategic buyers, and then the strategic buyers concurrently leased all of the real properties back to the Company.

## THE MATERIALLY MISLEADING PROXY

141.    In connection with the Acquisition, defendants disseminated the Proxy.

142. In the Proxy, defendants omitted the following information:

(a) management's financial projections reflecting the scenario where Ruby Tuesday monetizes its real estate (*e.g.*, through a sale and leaseback or financing transaction) and completes the turnaround plan to return value to the Company's stockholders;

(b) management's sale and leaseback analysis and valuation based on same;

(c) same store sales growth rate numbers for fiscal years 2018-2022; and

(d) management's financial projections dated November 11, 2016, February 6, 2017 and March 7, 2017, each which were provided to the Board, used to value the Company by UBS, and indicated higher valuations for the Company than the revised down, lowest financial projections used in the fairness analyses.

143. These omissions were material because a reasonable shareholder would consider this information important in deciding whether to vote in favor of the Merger.

144. Specifically, this information was necessary for stockholders to assess the likelihood that Ruby Tuesday would effectuate its turnaround plan and return stockholder value as promised by management. Stockholders needed this information in order to evaluate the choice they were being asked to make – accept the Merger consideration that reflected the depressed value caused by Ruby Tuesday's current underperformance, or stay in the hopes that the Company's valuable real estate would provide the runway for management  effectuate its turnaround plan to return value to the Company's stockholders, as management promised it could do.

145. As demonstrated above by the factual allegations, and summarized in this section, Ruby Tuesday was an underperforming company in the years preceding the Merger. However, management had a viable, turnaround plan that it expected would return value to shareholders in the long-term. *See* ¶¶37-46, 53-61, 68-73, 81-86, 100-101, 121-124.

146. Moreover, Ruby Tuesday owned valuable real estate worth at least $600 million. This allegation is supported by the following:

(a) an article estimated that Ruby Tuesday had assets of about $600 million, on the assumption of the ownership of only 300 locations (*see* ¶94);

(b) as of September 5, 2017, Ruby Tuesday in fact owned 541 restaurants (*see* ¶125);

(c) Ruby Tuesday sold underperforming properties for approximately $1.4 million per location as part of its Asset Rationalization Plan (*see* ¶100);

(d) as of June 2017, the average listing price was over $2 million for recent Ruby Tuesday locations listed for sale (*see* ¶111); and

(e) a Ruby Tuesday stockholder indicated, based on "conversations with industry operators" that the average company owned-location was worth approximately $2 million. *See id.*

147. As the Company's management and Board were aware, the Company's real estate provided the Company with strategic alternatives not normally available to a underperforming Company, such as a sale and leaseback or financing transaction. *See* ¶¶57-58, 65-67, 77, 80, 88, 94, 98, 107, 111-112, 117.

148. Each member of the Board was provided information and analysis about the opportunities to unlock value from Ruby Tuesday's real estate holdings through a sale and leaseback or financing transaction numerous times, including with in numerous Board meetings with UBS, throughout 2017. *See id.*

149. Each Individual Defendant was also informed of the viability of alternatives which could unlock value from Ruby Tuesday's real estate holdings (sale and leaseback or financing transaction), including from various third parties who were interested in same. *See id.*

150.    However, Ruby Tuesday's Board – after going through management changes, litigation based on large stock drops, threat of proxy contests, and threat of personal litigation – had personal incentives to sell the Company rather than stay on and effectuate the turnaround plan. *See* ¶¶47-49, 51, 62, 75-76, 95-96, 110-112, 118.

151.    Thus, the Board chose to agree to a Merger for $2.40 per share, representing an enterprise value of approximately $335 million. *See* ¶¶126-132.

152.    And the Board omitted information identified in ¶142 above, that would permit stockholders to assess whether $2.40 per share was more valuable than the viable strategic alternatives available to the stockholders, thus inducing stockholders to accept the $2.40 Merger consideration rather than vote no, and retain the opportunity for a more valuable alternative.

153.    The omitted information identified in ¶142 above, rendered the following statements in the Proxy misleading:

(a)    statements representing that the Merger and $2.40 price was fair and in the best interests of Ruby Tuesday's stockholders  (*see* Proxy (stating that the Board determined that the Merger was "advisable and fair to and in the best interests of Ruby Tuesday stockholders"); *id*. at 45 (stating that the Board determined that the Merger was "fair to, and in the best interests of, Ruby Tuesday and its stockholders"));

(b)    statements representing that UBS's fairness opinion supported defendants' position (*see* Proxy at 52 (listing as a factor supporting the Board's Merger decision, "the opinion of UBS presented orally to the Ruby Tuesday board on October 15, 2017 and subsequently confirmed in writing, to the effect that, as of the date of such opinion and based on and subject to the various factors, assumptions, qualifications and limitations described therein, the merger consideration of $2.40 per share to be received by holders of Ruby Tuesday common stock pursuant to the merger agreement was fair, from a financial point of view, to such holders"));

(c)     the summary of UBS's fairness analyses on pages 51 and 52 of the Proxy, and UBS' conclusion that the $2.40 price was "fair, from a financial point of view, to [the Company's stockholders]"[2]; and

(d)     the statement representing that the $2.40 price was more favorable than strategic alternatives, including strategies to unlock value from Ruby Tuesday's real estate holdings (*e.g.*, through a sale and leaseback or financing transaction) (¶133).

154.    The omission rendered the above statements misleading because the Proxy was a formal document filed with the SEC in connection with a cash-out merger and set forth the recommendation of each Individual Defendant in favor of the Acquisition and the purported reasons why each Individual Defendant believed that the Acquisition and the Acquisition price was fair and in the best interest of Ruby Tuesday's stockholders.  Under these circumstances, the Company's shareholders reasonably expected that the above statements were consistent with the information in defendants' possession.

155.    However, defendants had material information in their possession that contradicted these statements – the omitted information identified in ¶142 above.  The material omitted information identified in ¶142 above would reveal to the Company's stockholders, the existence of viable, strategic alternatives more valuable than the Merger.  Accordingly, it was misleading for defendants to make the statements in ¶142 above, indicating their support for the Merger, without fully disclosing the information in the their possession identified in ¶142 above.

156.    Each Individual Defendant was a member of the Board when the Proxy was disseminated and had the power to influence and control and *did* influence and control, directly or indirectly, the content and dissemination of the Proxy.  The Proxy contained the unanimous

---

[2]    Additionally, the proxy supplement filed on December 11, 2017 contained additional information regarding UBS's financial analyses.

recommendation of each of the Individual Defendant to approve the Acquisition. Each Individual Defendants was thus directly involved in and responsible for the statements in the Proxy.

157.    The Proxy was an essential link in the accomplishment of the Merger. As detailed above, the Company's stockholders were precluded from making a fully informed decision in connection with a Merger and the Merger consideration was inadequate.

## COUNT I

### For Violations of §14(a) of the 1934 Act and Rule 14a-9
### Promulgated Thereunder Against the Individual Defendants

158.    Plaintiff repeats and realleges each allegation set forth herein.

159.    The Individual Defendants disseminated the misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

160.    The Proxy was prepared, reviewed and/or disseminated by each Individual Defendant. The Proxy misrepresented and/or omitted material facts, as set forth in ¶¶141-157, above.

161.    In so doing, the Individual Defendants omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company and their active involvement in the misconduct alleged herein, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

162.    By virtue of their positions as officers and/or directors of Ruby Tuesday and participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company,

including the content and dissemination of the various statements which Plaintiff contends are misleading.

163.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

164.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular actions giving rise to the securities violations as alleged herein, and exercised the same.     The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.     They were thus directly involved in the making of this document.

165.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Acquisition.     The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants.

166.     The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

167.     As a direct result of defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiff and the Class were induced to vote their shares and accept the inadequate consideration of $2.40 per share in connection with the Acquisition.     The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition deprived Plaintiff and the class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Ruby Tuesday shares.     At all times relevant to the dissemination

of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning Ruby Tuesday's true value, which was far greater than the $2.40 per share Ruby Tuesday's shareholders received. Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Acquisition, plaintiff and the Class have suffered damage and actual economic losses (*i.e.*, the difference between the price Ruby Tuesday shareholders received in the Merger and Ruby Tuesday's true value at the time of the Merger) in an amount to be determined at trial.

168. The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on an acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in a proxy and in other information reasonably available to shareholders. The false and misleading Proxy had the intended effect: a materially misinformed vote of the Ruby Tuesday shareholders, who voted in favor of the Acquisition on December 20, 2017.

169. By reason of the foregoing, the Individual Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

170. Because of the false and misleading statements in the Proxy, Plaintiff and the members of the Class were harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment, in Plaintiff's favor and in favor of the Class and against defendants, as follows:

A. Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 21, 2018

BARRETT JOHNSTON MARTIN
   & GARRISON, LLC
JERRY E. MARTIN, #20193
DAVID GARRISON, #24968


/s/ David W. Garrison
DAVID W. GARRISON

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID T. WISSBROECKER
DANIELLE S. MYERS
EUN JIN LEE
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
DWissbroecker@rgrdlaw.com
DaniM@rgrdlaw.com
elee@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER H. LYONS, #034853
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
CLyons@rgrdlaw.com

JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
40 Powder Springs Street
Marietta, GA 30064
Telephone: 770/200-3104
770/200-3101 (fax)

Attorneys for Plaintiff